IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LOUIS C. BECHTLE, in his capacity as Receiver for Acorn II, L.P., Acorn Capital Management, LLC and any entities that Acorn II, L.P., or Acorn Capital Management, LLC own or control or in which any of them have an interest | : : : : : : : : | CIVIL ACTION |
| v. | : : | |
| MASTER, SIDLOW & ASSOCIATES, P.A., et al. | : : | NO. 10-5195 |

## MEMORANDUM

Padova, J.                                                                                                                                                                            February 7, 2011

Louis C. Bechtle, the Court-appointed Receiver for Acorn II, L.P., Acorn Capital Management, LLC (collectively, the "Acorn Entities"), and other related entities, filed this professional negligence action against Defendants Master, Sidlow & Associates, P.A. ("Master Sidlow"), William Master, Frank Sidlow, Michael McCuddon, and Juan Pablo Vasquez, in connection with accounting and auditing services that Defendants provided to the Acorn Entities. Defendants have filed a Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the doctrine of *in pari delicto* bars the Receiver's claims because the Acorn Entities are at least equally responsible for the wrongs alleged. For the reasons that follow, we deny Defendants' Motion.

**I.     BACKGROUND**

The Complaint alleges that, at all relevant times, Master Sidlow acted as auditor for Acorn II, L.P. ("Acorn II"). (Compl. ¶ 9.) Also at all relevant times, Defendants William Master, Frank Sidlow, and Michael McCuddon were licensed accountants with Master Sidlow, and Juan Pablo Vasquez was an employee of firm, under the supervision of McCuddon. (Id. ¶¶ 10-13.) Both Acorn

II and Acorn Capital Management II, Limited Partnership ("ACM II") (collectively, the "Limited Partnerships") were created to invest in securities and other instruments of the United States. (Id. ¶ 18.) The General Partner of each of the two Limited Partnerships was Acorn Capital Management, LLC ("Acorn Capital") and, in that capacity, Acorn Capital served as the Limited Partnerships' investment advisor. (Id. ¶¶ 18-19.) Donald Young was the managing member of Acorn Capital, and a partner of that firm. (Id. at ¶ 18.) Young controlled Acorn Capital, with the company acting by and through him. (Id. ¶ 19.) In 2005, R. Stewart Strawbridge, who had worked for Acorn Capital since 2001, acquired a 20% interest in the company, thereby becoming partners with Young. (Id. ¶ 20.)

In the course of their operations, the Limited Partnerships solicited and accepted funds from investors, who then served as the partnerships' limited partners. (Id. ¶ 22.) However, instead of properly investing those funds, Young conducted a Ponzi scheme whereby he used investments from new limited partners to pay previous investors. (Id.) Young also diverted investor funds to his own personal accounts, and used the funds for his and his family's benefit and to pay their personal expenses. (Id. ¶ 24.) Indeed, from November 1999, when ACM II was formed, through June 25, 2009, substantially all of Young's income was derived from Acorn Capital, ACM II and/or Acorn II. (Id. ¶ 25.)

In March of 2003, Young, on behalf of Acorn II, engaged Master Sidlow and McCudden to perform an audit of Acorn II's balance sheet and related statements of income as of December 31, 2001 and 2002, and to prepare Acorn II's federal and state tax returns. (Id. ¶¶ 29-30.) Master Sidlow subsequently was engaged to perform the same audit and tax services for Acorn II for the years 2003 through 2007, and to perform similar audit and tax services for ACM II for the years 2006

2

and 2007. (Id. ¶ 32.) Master Sidlow issued an "unqualified audit opinion" in connection with each year's auditing services, concluding that the financial statements were fairly presented in all material respects and were in conformity with Generally Accepted Accounting Principles. (Id. ¶ 33.) In addition to the audit and tax services, Master Sidlow provided additional services for Acorn II and Acorn Capital, including but not limited to, maintenance of books and records, expense and fee calculations, and review and authorization of wire disbursements. (Id. ¶ 36.) When performing bookkeeping and compilation services, Master Sidlow primarily relied on monthly account statements from CRESAP, a company that was Acorn II's custodian and which maintained the brokerage account for Acorn II's investments. (Id. ¶¶ 37-38.)

The Complaint alleges that, in performing services for Acorn II, Master Sidlow failed to adhere to proper auditing standards and recklessly disregarded numerous indications that Young was running a Ponzi scheme. (Id. ¶ 39.) Among the Generally Accepted Auditing Standards ("GAAS") that Defendants allegedly violated were standards requiring that they (1) "exercise and maintain professional skepticism and independent mental attitude" when conducting an audit (id. ¶¶ 41-42; see also id. ¶ 69); (2) ascertain and implement alternative measures to test for fraud when the company being audited has no internal controls in place (id. ¶¶ 48, 65); (3) "prepare audit documentation that enables an experienced auditor, having no previous connection to the audit, to understand the work performed . . . , the audit evidence obtained, and results and conclusions" (id. ¶¶ 52-54); and (4) obtain sufficient competent evidence to afford a reasonable basis for an opinion regarding the financial statements under audit, including reliable information from independent sources (id. ¶¶ 41e, 42, 44-50).

The Complaint alleges, among other things, that Defendants relied heavily on CRESAP's

3

monthly account statements, which listed contributions and withdrawals from investor accounts, but did not specify the partner who contributed or withdrew the funds in each instance. (Id. ¶ 43.) To ascertain what each partner contributed and withdrew, Defendants emailed Young, who provided Defendants with false information, which Defendants neither questioned nor verified but, rather, "blindly accepted." (Id. ¶¶ 44-45, 47.) Similarly, Defendants relied on Young to explain suspicious or questionable activity in the investor accounts, including situations in which investor accounts were overdrawn, and they accepted his explanations without question. (Id. ¶ 46.) By proceeding in this fashion, Defendants failed to rely on proper supporting documentation and failed to exercise professional skepticism and independence. (Id. ¶ 53.)

The Complaint further alleges that Defendants "willfully ignored, recklessly disregarded, or cast a blind eye to the numerous indications that Young was running a Ponzi scheme." (Id. ¶ 60.) For example, in a 9-month period, there were at least 36 transfers from an Acorn II account held at CRESAP to Young's personal account, "yet falsely attributed to various Acorn II investors." (Id. ¶ 61.) In addition. Defendants ignored "exponential, irregular increases in activity in the Acorn II account," such as numerous occasions in which money was being deposited and withdrawn from the same investor account in the same day; one occasion in which Young opened an account and withdrew 75 percent of it within three months; and one occasion in which Young opened an account and then withdrew more than the amount invested within six months. (Id. ¶ 63.) The Complaint alleges that, by failing to properly monitor such activity in accordance with their professional responsibilities, Defendants enabled Young's perpetration of the fraud. (Id. ¶ 64.)

The Complaint further alleges that Defendants did not act as an "independent" auditor as GAAS require, because it acted as both bookkeeper and auditor for Acorn II, thereby creating a

conflict of interest. (Id. ¶¶ 67-68, 73.) The bookkeeping functions Defendants undertook included maintaining and preparing accounting records for Acorn II, preparing cash receipts and cash disbursement entries, preparing bank reconciliation, and calculating management fees. (Id. ¶¶ 71-72.) By performing these functions, while simultaneously acting as auditor, Defendants essentially put themselves in the position of reviewing their own work. (Id. ¶ 73.)

On April 17, 2009, the Securities and Exchange Commission filed a civil Complaint against Young and the Acorn Entities, which accused them of violating various securities laws by running a Ponzi scheme, and which requested a temporary restraining order and an order freezing the assets of the Acorn Entities. (Id. ¶ 1.) On June 25, 2009, this Court issued an order appointing Louis C. Bechtle as Receiver for the Acorn Entities (the "Receiver"). (Id. ¶ 2.) The Receiver was charged with "investigating, marshaling and preserving . . . the assets, monies, securities, choses in action and properties . . . of the Acorn Entities in order to maximize the recovery available to the investors defrauded during Young's operation of the Ponzi scheme." (Id. ¶ 3.) Young has since admitted to misappropriating funds invested with the Acorn Entities to, among other things, pay other investors in the entities and fund his family's personal expenditures. (Id. ¶ 4.) On July 20, 2010, Young also pled guilty to charges of mail fraud and money laundering in a related criminal action. (Id. ¶ 5.)

The Complaint in the instant case asserts five claims against Defendants, based on the theory that Defendants enabled and facilitated Young's wrongful conduct and caused harm to the Acorn Entities. The five Counts assert claims of professional negligence, aiding and abetting fraud, aiding and abetting breach of fiduciary duty, breach of contract, and unjust enrichment. Defendants argue in their Motion to Dismiss that all five claims are barred by the doctrine of *in pari delicto*.

## II. STANDARD OF REVIEW

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), we look primarily at the facts alleged in the complaint and its attachments. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). In the end, we will grant a Rule 12(b)(6) motion if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004)).

## III. DISCUSSION

Defendants argue in their Motion to Dismiss that the *in pari delicto* doctrine precludes the Receiver, while standing in the shoes of Acorn II and Acorn Capital, from maintaining a suit against Defendants for allegedly failing to detect the wrongful acts of the Young and the Acorn Entities. The doctrine of *in pari delicto* is a defense in actions at law. Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouse Coopers, LLP, 989 A.2d 313, 328 (Pa. 2010) ("Allegheny I"). It essentially applies to relieve a defendant of liability where the plaintiff was "an active, voluntary participant in the wrongful conduct or transaction(s) for which it seeks redress" and "bear[s] 'substantially equal [or greater] responsibility for the underlying illegality' as compared to the defendant." Id. at 329 (first and third alterations in original (quoting McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 757 (3d Cir. 1990))). The defense thereby "serves the public interest by relieving courts from lending their offices to mediating disputes among wrongdoers." Id. The defense is, however, subject to "appropriate and necessary limits." Id. at 330. Such limits arise out of public policy, which should be "taken into consideration in determining the defense's availability in any given set of circumstances." Id. (citations omitted). In other words, the defense should not be "woodenly applied and vindicated in any and all instances in which the culpability of the plaintiff can be said to be at least equal to that of the defendant." Id. (citation omitted).

Defendants' *in pari delicto* argument primarily relies on Allegheny I, a February 2010 decision from the Pennsylvania Supreme Court, which addresses the application of the *in pari delicto* defense in accountant liability cases. Allegheny I was issued in response to two certified questions from the United States Court of Appeals for the Third Circuit. Essentially, the Third Circuit asked

7

the Pennsylvania Supreme Court for guidance as to (1) the circumstances under which fraudulent conduct by agents of a plaintiff company may be imputed to the plaintiff company, when an allegedly non-innocent defendant "seeks to invoke the law of imputation to shield itself from liability;" and (2) whether the doctrine of *in pari delicto* will bar a plaintiff company from recovering against its accountants if the accountants conspired with agents of the plaintiff company to misstate the company's finances to the company's detriment. Allegheny I, 989 A.2d at 318-19.

The Pennsylvania Supreme Court issued a lengthy and detailed opinion in response to the certified questions. In doing so, it made clear that imputation is a necessary prerequisite to the assertion of an *in pari delicto* defense to the claims of a plaintiff company. See id. at 333 ("[A]ttribution of the officers' wrongdoing to [the plaintiff company] is a linchpin to [the auditor's] *in pari delicto* defense."). It further clarified that:

> The proper test to determine the availability of defensive imputation in scenarios involving non-innocents depends on whether or not the defendants dealt with the principal in good faith. While one of the primary justifications for imputation lies in the protection of innocents, in Pennsylvania, it may extend to scenarios involving auditor negligence, subject to an adverse interest exception, as well as other limits arising out of the underlying justifications supporting imputation. Imputation does not apply, however, where the defendant materially has not dealt in good faith with the principal.

Id. at 339.

The Court summarized its response to the second certified question as follows:

> The *in pari delicto* defense may be available in its classic form in the auditor-liability setting, subject to ordinary requirements of pleading and proof (including special ones related to averments of fraud where relevant), and considerations of competing policy concerns. However, . . . imputation is unavailable relative to an auditor which has not dealt materially in good faith with the client-principal. This effectively forecloses an *in pari delicto* defense for scenarios

8

>involving secretive collusion between officers and auditors to misstate corporate finances to the corporation's ultimate detriment.

Id.

Consequently, in order for a defendant accountant to assert an *in pari delicto* defense against a plaintiff company based on fraud committed by the company's agent, the defendant must initially establish that it is appropriate to impute the agent's fraud to the company. While the primary purpose of imputation is to protect innocent victims of corporate fraud, accountants alleged to have negligently performed their duties to the company may also successfully argue for imputation if at least three conditions are met. First, they must typically establish that the actions of the company's agent were for the company's benefit, not adverse to the company's interests. See Official Comm. of Unsecured Creditors of Allegheny Health & Educ. Research Found., 607 F.3d 346, 352 (3d Cir. 2010) ("Allegheny II") ("[A] third party would generally be able to impute an agent's bad acts to the principal corporation if they benefit the corporation."); see id. (stating that under the "adverse interest" exception to imputation, "a third party [may not] impute an agent's bad acts to the principal corporation if those bad acts were only in the agent's self-interest and conferred benefits only to the agent, not the corporation"). Second, the accountants must have dealt in "good faith" with the plaintiff company. Allegheny I, 989 A.2d at 339; Allegheny II, 607 F.3d at 355 ("[The] *in pari delicto* . . . defense is conditioned on the auditor dealing materially in good faith with the client-principal.") Third, there must be no other applicable "limits arising out of the underlying justifications supporting imputation," i.e., public policy considerations, that would counsel against imputation. Allegheny I, 989 A.2d at 339.

In arguing that the Receiver's Complaint should be dismissed based on the *in pari delicti*

defense, Defendants essentially argue that the Complaint alleges no facts that would counsel against imputation in this case and that, as a result, the *in pari delicto* defense should bar the Receiver's claims. Specifically, Defendants argue that the Complaint contains no allegations that Defendants had actual knowledge of Young's fraud, or that they colluded with Young in misstating the Acorn Entities' finances. They also argue that the Complaint's allegations, taken as true, dictate that the "adverse interest" exception to imputation does not apply, because the Complaint alleges that Young completely controlled Acorn Capital. Defendants argue that, under such circumstances, the "adverse interest" exception to imputation is itself subject to the "sole actor" exception, which provides that "if an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests." Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 359 (3d Cir. 2001) (citation omitted). Defendants also maintain that there is no restriction on the *in pari delicto* defense being asserted against a court-appointed receiver who is marshaling the assets of a business entity against whom the defense ordinarily would be asserted. In this regard, Defendants rely primarily on two cases, one from the United States Court of Appeals for the Seventh Circuit and one from the Middle District of Florida. (Defs.' Mem. at 8-9 (citing Knauer v. Jonathan Roberts Fin. Group, Inc., 348 F.3d 230 (7th Cir. 2003); In re Wiand, Civ. A. No. 05-1856, 2007 WL 963165 (M.D. Fla. Mar. 27, 2007)).

  We have carefully considered all of these arguments, but are not convinced at this stage of the proceedings, based solely on the Complaint's allegations and the law Defendants have cited, that the Receiver has not stated a claim upon which relief may be granted because the *in pari delicto* defense bars his claims. While Defendants argue that the Complaint does not allege sufficient facts

10

to support a conclusion that imputation is <u>un</u>available in this case, because the Complaint neither alleges that Defendants colluded with Young nor supports an inference that the adverse interest exception applies, it does not follow that the imputation defense must be available. As an initial matter, Defendants have pointed to no definitive Third Circuit or Pennsylvania authority regarding the availability of the *in pari delicto* defense against a receiver. We are also reluctant to rely on Seventh Circuit authority on this issue, because <u>Allegheny I</u> makes clear that Pennsylvania law is not in accord with Seventh Circuit law, at least insofar as the Seventh Circuit permits more liberal use of the *in pari delicto* defense in order to incentivize internal corporate monitoring. <u>Allegheny I</u>, 989 A.2d at 332 ("[W]e . . . find that Pennsylvania law does not accord with [<u>Cenco v. Seidman & Seidman</u>, 686 F.2d 449 (7th Cir. 1982),] in terms of the degree to which the decision, in an auditor-liability context, prioritizes the policy of incentivizing internal corporate monitoring over the objectives of the traditional schemes governing liability in contract and in tort, including fair compensation and deterrence of wrongdoing." (footnote omitted)). Moreover, <u>Allegheny I</u> makes clear that we are not to "woodenly appl[y]" the *in pari delicto* defense and we should consider public policy "in determining the defense's availability in any given set of circumstances." <u>Allegheny I</u>, 989 A.2d at 330; <u>see also</u> <u>id.</u> at 339 (stating that imputation is subject to "other limits arising out of the underlying justifications supporting imputation").

Furthermore, we do not believe that the Complaint's lack of allegations of collusive activity necessarily dictates a conclusion that Defendants acted in good faith. Indeed, while <u>Allegheny I</u> and <u>Allegheny II</u> make it clear that auditors who engage in "secretive collusive dealings" are not acting in good faith, "it does not follow that . . . if . . . a third party [has not] engaged in 'secretive, collusive dealings' with the agents, then the third party dealt in good faith with the principal." <u>Adelphia</u>

11

Recovery Trust v. Bank of America, N.A., Civ. A. No. 05-9050, 2010 WL 3452374, at *5 (S.D.N.Y. Sept. 1, 2010) (applying Allegheny I and Allegheny II) (footnote omitted). Thus, we cannot presume good faith based solely on the lack of specific allegations of collusive activity in the Complaint. Such a presumption would be particularly inappropriate here where the Complaint contains allegations that plausibly suggest that Defendant did not act in good faith insofar as they, among other things, "blindly accepted" Young's explanations for suspicious account activities (Compl. ¶¶ 44-47), and "willfully ignored . . . numerous indications that Young was running a Ponzi scheme" (id. ¶ 60).

We are also unconvinced by Defendants' argument that we need not consider whether Young's actions benefitted the Acorn entities or were adverse to their interests because the Complaint makes it clear that the "sole actor" exception applies. Significantly, Defendants have cited to no definitive authority to support their premise that Pennsylvania would recognizes the "sole actor" exception under the circumstances presented here.[1] Indeed, the Complaint alleges that at least one other individual, R. Stewart Strawbridge, owned a significant stake in Acorn Capital as of 2005, and that Strawbridge held positions with the company before that time, including the position of "Chartered Financial Analyst" from 2001 to 2003. (Compl. ¶ 20.) Taking these factual allegations as true, Young may not have been the "sole representative of the principal" at all relevant times. R.F. Lafferty, 267 F.3d at 359. Accordingly, we cannot conclude that the Complaint's allegations,

---

[1] As Defendants point out, the Pennsylvania Supreme Court commented in Allegheny I that "[w]ere the action between a corporation controlled by a single individual and a sole-proprietor auditor, there would be a good case to be made that *in pari delicto* should apply to negate all causes of action arising out of intentional auditor misrepresentations made at the behest of the owner, and thus, with full corporate complicity." 989 A.2d at 331. However, the Pennsylvania Supreme Court did not hold that the defense would necessarily apply in such a case; it merely commented that "there would be a good case to be made" that it would.

12

taken as true, necessarily dictate that the "sole actor" exception applies here.

**IV.    CONCLUSION**

Defendants' argument that the allegations of the Complaint make clear that the *in pari delicto* defense is applicable in this case and absolves them of all liability, rests on underdeveloped legal arguments and oversimplifications of the legal requirements for the application of that defense. Accordingly, we cannot ascertain whether the Receiver may be subject to the *in pari delicto* defense without a full evidentiary record and more extensive legal briefing. We therefore conclude that the Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570). Consequently, we deny Defendants' Motion to Dismiss.

An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

------------------------------

John R. Padova, J.