# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LOUIS C. BECHTLE, in his capacity as Receiver for Acorn II, L.P. and Acorn Capital Management, LLC. et. al.,** | : | |
| | : | |
| | : | |
| | : | **Civil Action No.: 2:10-cv-05195-JP** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **Master, Sidlow & Associates, P.A., William Master, Frank Sidlow, Michael McCudden, and Juan Pablo Vasquez,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## THE RECEIVER'S RESPONSE TO DEFENDANTS' STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT

Plaintiff Louis C. Bechtle, Court-appointed Receiver for, *inter alia*, the assets and records of Acorn II, L.P. ("Acorn II") and Acorn Capital Management, LLC ("Acorn Capital") (Acorn II and Acorn Capital collectively referred to as the "Acorn Entities"), submits this Response to Defendants' Statement of Uncontested Material Facts.

As discussed in the Receiver's Memorandum of Law, this Court should deny Defendants' motion because it ignores Defendants' liability for the accounting services work that they performed for the Acorn Entities. Defendants breached their legal duties to Acorn as both auditors *and* accounting services professionals, which give rise to independent bases of liability. Because Defendants simply ignore the accounting services piece, the Receiver denies all of the factual allegations regarding the work they performed for the Acorn Entities as a mischaracterization of the evidence and an attempt to draw an unsupported inference.

Further, with regard to the audit piece, Defendants have excluded any and all evidence regarding their numerous audit failures. Since Defendants have selectively chosen which facts to include in their Statement of Uncontested Material Facts, the Receiver has added a section to this Response titled "Additional Facts Precluding the Entry of Summary Judgment." The Court must consider all of the facts set forth below in analyzing Defendants' Motion for Summary Judgment, and determining whether the Receiver has established a triable issue of fact.

## I.     THE RECEIVER'S SPECIFIC RESPONSES TO DEFENDANTS' FACTS

1.     Not disputed.

2.     Not disputed.

3.     Not disputed.

4.     Not disputed.

5.     Not disputed.

6.     Not disputed.

7.     Not disputed that Plaintiff, in his capacity as Receiver for the assets and records of Acorn II and Acorn Capital, filed suit against Defendants on October 5, 2011, in the case captioned *Bechtle v. Master Sidlow, et. al.*, (No. 10-05195).

### A.     Defendant Master, Sidlow and Associates, P.A. ("MSA") Services

8.     Disputed. Defendant Michael McCudden testified that Defendants signed Acorn II as a client "at the end of 2001." *See* Ex. A, Deposition Transcript of Michael McCudden, dated Aug. 12, 2011, ("McCudden Dep.") at 61: 19–22. Furthermore, Gina Nardo, the MSA employee assigned to audit Acorn II's 2001 financial statements, completed the fieldwork for that audit on March 6, 2002. *See* Ex. B, 2001 Audit Financial Engagement Sheet. The Receiver also disputes this allegation on the basis that it mischaracterizes the scope of Defendants'

retention and seeks to draw an unsupported inference. Defendants were engaged to perform more than just the audit and tax work for the Acorn Entities. In addition to performing those services, Defendants also served as Acorn's internal accounting department and performed the accounting services work throughout their engagement. *See* Ex. C, Defendants' Billing Records; Ex. D, The Expert Report of James T. Ashe, dated Aug. 2, 2011, ("Ashe Report") at 9–11, 22–23; Ex. E, The Supplemental Report of James T. Ashe, dated Oct. 13, 2011 ("Ashe Supplement") at 3–4; Ex. F, Deposition Transcript of Juan Vasquez dated Oct. 4, 2011 ("Vasquez Dep."), at 32, 54–56, and 211.

9.      Disputed as vague. Assuming that Defendants are referring to the financial statements for year ended December 31, 2001, the Receiver does not dispute that neither Defendant Michael McCudden nor Defendant Frank Sidlow reviewed or authorized the release of those financials. Moreover, Gina Nardo, the MSA employee assigned to audit Acorn II's 2001 financial statements, completed the fieldwork for that audit on March 6, 2002. *See* Ex. B, 2001 Financial Engagement Sheet. Furthermore, Defendants did sign and release the Acorn II financial statements for year ended 2002, despite never having reviewed the previous year's audit fieldwork. *See* Ex. C, Ashe Report at 7.

10.     Disputed on the basis that Defendants mischaracterize the evidence and seek to draw an unsupported inference. Not disputed that Defendants were engaged to prepare the audit and tax returns for year ended December 31, 2002. Defendants, however, were also retained as Acorn's accountants and performed accounting services work for Acorn II. *See* Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at 3; Ex. F, Deposition Transcript of Juan Vasquez dated Oct. 4, 2011 ("Vasquez Dep."), at 32, 54–56, and 211.

11.     Disputed as vague.  Assuming Defendants are referring to the audited financial statements for year ended December 31, 2002, the Receiver does not dispute that Defendants have not produced any financial engagement sheet for that document.  It is important to note that a "financial engagement sheet," is a document that identifies on what date and by whom the work relating to a particular audit was performed.  The Receiver does not dispute that he has not produced Acorn II financial statements for the year ended December 31, 2002.

12.     Disputed as vague and unsupported by the evidence in the record.  The Receiver does not understand which audited financials Defendants are referring to, nor does he understand the relevance of Defendants' analysis regarding the purported date on that document. Furthermore, Defendants have not offered any evidence in support of this fact, and it is therefore denied.

13.     Disputed in part and admitted in part.  The document referenced as Exhibit 4A to Defendant Frank Sidlow's deposition and referenced in Defendants' Statement of Uncontested Material Facts indicates that, on August 3, 2004, Defendant Michael McCudden (not Acorn II) "released" the unqualified audit opinion on Acorn II's financial statements for year ended December 31, 2003.   The Receiver does not dispute that the audit fieldwork for the financial statements for year ended 2003 was performed in 2004, and that the audited financial statements were not issued by Defendants until August 3, 2004.  Defendants also acted as Acorn's internal accounting department and performed "accounting services" work for the Acorn Entities, including the preparation of investor quarterly evaluation summaries.  *See* Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at 3–4; Ex. F, Vasquez Dep. at 61–64.

4

14.     Disputed in part and admitted in part.  The document referenced as Exhibit 4A to Defendant Frank Sidlow's deposition and referenced in Defendants' Statement of Uncontested Material Facts indicates that, on October 18, 2005, Defendant Michael McCudden (not Acorn II) "released" the unqualified audit opinion on Acorn II's financial statements for year ended December 31, 2004.   The Receiver does not dispute that the audit fieldwork for the financial statements for year ended 2004 was performed in 2005, and that the audited financial statements were not issued by Defendants until October 18, 2005.  Defendants also acted as Acorn's internal accounting department and performed "accounting services" work for the Acorn Entities, including the preparation of investor quarterly evaluation summaries.  *See* Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at 3–4; Ex. F, Vasquez Dep. at 61–64.

15.     Not disputed that Defendants performed the fieldwork but never released the audited financial statements for year ended December 31, 2005.  Defendants were also acted as Acorn's internal accounting department and performed "accounting services" work for the Acorn Entities, including the preparation of investor quarterly evaluation summaries.  *See* Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at 3–4; Ex. F, Vasquez Dep. at 61–64.

16.     Disputed.  The document referenced as Exhibit 4A to Defendant Frank Sidlow's deposition and referenced in Defendants' Statement of Uncontested Material Facts indicates that, on June 14, 2007, Defendant Michael McCudden (not Acorn II) "released" the unqualified audit opinion on Acorn II's financial statements for year ended December 31, 2006.  Defendants also acted as Acorn's internal accounting department and performed "accounting services" work for the Acorn Entities, including the preparation of investor quarterly evaluation summaries.  *See* Ex.

C, Defendants' Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at

3–4; Ex. F, Vasquez Dep. at 61–64.

17.    Disputed.  The evidence cited by Defendants does not state that the audited

financials for the year ended December 31, 2007 were released and/or delivered on January 27,

2009.  Furthermore, the document referenced as Exhibit 4A to Defendant Frank Sidlow's

deposition and referenced repeatedly in Defendants' Statement of Uncontested Material Facts

indicates that Defendant Juan Vasquez completed the fieldwork of that audit on June 10, 2008,

and Defendant Frank Sidlow completed the review of that work on June 17, 2008.  Defendants

also acted as Acorn's internal accounting department and performed "accounting services" work

for the Acorn Entities, including the preparation of investor quarterly evaluation summaries.  *See*

Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe

Supplement at 3–4; Ex. F, Vasquez Dep. at 61–64.

18.    Not disputed.

19.    Not disputed that Defendant Frank Sidlow served as a Director for MSA and was

in charge of the firm's accounting assurance and quality control during the relevant time period.

The Receiver further alleges that Defendant Frank Sidlow was also one of the partners in charge

of reviewing and signing the Acorn II audit for years 2005 through 2007.  *See* Ex. G, 2006–2007

Financial Engagement Sheets; Ex. A, McCudden Dep. at 91: 20–22.  In addition, the facts

establish that although Mr. Sidlow was in charge of reviewing and signing the Acorn II audit

during those years, he spent only 6.7 total hours per year reviewing Defendant Juan Vasquez's

work on those audits.  *See* Ex. C, Defendants' Billing Records; Ex. D., Ashe Report at 22–23.

20.    Not disputed that Defendants have attached Defendants' engagement letter

between them and Acorn II dated April 10, 2007.  The Receiver does not dispute that Defendants

used the same engagement letter during each year that they were engaged to perform work for

the Acorn Entities.  The Receiver disputes, however, any unsupported inference that Defendants'

services were limited solely to auditing Acorn II.   Defendants also acted as Acorn's internal

accounting department and performed "accounting services" work for the Acorn Entities,

including the preparation of investor quarterly evaluation summaries.  *See* Ex. C, Defendants'

Billing Records; Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at 3–4; Ex. F,

Vasquez Dep. at 61–64.

      **B.**      **Young's Scheme to Defraud**

21.      Not disputed.

22.      Not disputed.

23.      Disputed as a legal conclusion and on the basis that Defendants mischaracterize

the evidence and seek to draw an unsupported inference.  Stewart Strawbridge purportedly

became a 20% partner in Acorn Capital in or around 2006, as reflected in tax documents

prepared by Defendants and in filings with the SEC.  *See* Defendants Statement of Uncontested

Facts, at ¶ 35; Ex. H, Excerpt from Acorn II Form ADV filed with the SEC.

24.      Not disputed.

25.      Not disputed.

26.      Disputed.  The limited partners in Acorn had did not have any role in the

management or operation of the Acorn Entities in their capacity as limited partners.  However,

Stewart Strawbridge was a managing member and limited partner in Acorn Capital.  *See*

Receiver's Response to Paragraph 23.  As admitted by Defendants, Strawbridge exercised

trading authority on the Acorn II account and placed trades as an "operating partner" of Acorn

Capital.  *See* Defendants Statement of Uncontested Facts, at ¶ 35.  Furthermore, Dixon Stroud

was an Acorn investor who assisted Young in raising funds for investment in Acorn. *See*

Young's Admissions, ¶¶ 18–19 (attached as Exhibit C to Defendants' Facts). Moreover, J.P.

Gulli worked as an independent contractor for Acorn Capital and was also an investor. *See* Ex. I,

J.P. Gulli Employment Contract and Miscellaneous Documents Reflecting Investment in Acorn

II.

27.    Disputed as a legal conclusion and on the basis that Defendants mischaracterize

the evidence and seek to draw an unsupported inference. Stewart Strawbridge was a managing

member of Acorn Capital and limited partner in Acorn II. *See* Receiver's Response to Paragraph

23. As admitted by Defendants, Strawbridge exercised trading authority on the Acorn II account

and placed trades as an "operating partner" of Acorn Capital. *See* Defendants Statement of

Uncontested Facts, at ¶ 35.

28.    Not disputed.

29.    Not disputed.

30.    Disputed on the basis that Defendants mischaracterize the evidence and seek to

draw an unsupported inference. Defendants prepared investor specific quarterly fund valuations

which materially misstated each investor's account balance, and which Young distributed to

Acorn II investors to facilitate his scheme. *See* Ex. E, Ashe Supplement at 3–4; Ex. F, Vasquez

Dep. at 61–64.

**C.    Redmond Stewart Strawbridge's Role**

31.    Not disputed.

32.    Not disputed that Strawbridge was a partner in Acorn Capital and also a limited

partner/investor in Acorn II.

33.    Not disputed.

8

34.     Not disputed that Strawbridge, during those time periods, exercised trading authority over the Acorn II account and placed trades as an "operating partner" of Acorn Capital.

35.     Not disputed.

36.     Not disputed.

37.     Disputed on the basis that Defendants mischaracterize the evidence and seek to draw an unsupported inference. Stewart Strawbridge was a managing member in Acorn Capital and limited partner in Acorn II. *See* Receiver's Response to Paragraph 23. As admitted by Defendants, Strawbridge exercised trading authority on the Acorn II account and placed trades as an "operating partner" of Acorn Capital. *See* Defendants Statement of Uncontested Facts, at ¶ 35.

## II.     ADDITIONAL FACTS PRECLUDING THE ENTRY OF SUMMARY JUDGMENT AGAINST THE RECEIVER

### A.     Defendant MSA Employees/Principals who Worked on the Acorn Account

38.     Defendant Juan Pablo Vasquez is a former MSA employee who performed the accounting services and audit fieldwork for the Acorn Entities from 2003 through the end of the Acorn engagement. *See* Ex. D, Ashe Report at 5; Ex. F, Vasquez Dep. at 12, 23, 28, 32, 54–56, and 211.

39.     Defendant Vasquez performed the majority of the accounting services and audit fieldwork on the Acorn account with minimal to no supervision from any MSA director. *See* Ex. D, Ashe Report at 22–23.

40.     Prior to working on the Acorn account, Defendant Vasquez had no experience auditing investment companies. *See* Ex. F, Vasquez Dep. at 96: 2–5; 125: 4–7; *See* Ex. S, Deposition Transcript of Juan Vasquez dated Mar. 30, 2011 ("Vasquez SEC Dep.") at 44: 19–23.

41.    Defendant Vasquez testified that he was not familiar with Generally Accepted Auditing Standards and Generally Accepted Auditing Principles, and was unable to describe the difference between a compilation and a financial statement audit. *See* Ex. F, Vasquez Dep. at 103:24 – 104: 2; 105–107.

42.    Defendant Vasquez did not know whether an auditor is required to test and verify information prior to expressing an opinion that a company's financial statements are accurately stated and free from material misstatement.  *See* Ex. F, Vasquez Dep. at 107: 20– 24. ("Q: Does an audit include verifying and testing information provided to you by the client? A: I don't know.")

43.    Defendant Michael McCudden is an MSA director and was the primary person responsible for MSA's provision of services to Acorn II. *See* Ex. A, McCudden Dep. at 36: 22– 37:1; Ex. D, Ashe Report at 5

44.    Although  Defendant Michael McCudden was the primary director responsible for the Acorn account, he spent only 2.5 hours between 2002 and 2008 reviewing Defendant Vasquez's audit fieldwork. *See* Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 22– 23.

45.    Defendant Frank Sidlow is a retired MSA director who performed pre-issuance review of the audited financial statements for Acorn II for years 2005-2007.  *See* Ex. A, McCudden Dep. at 91: 20–22; Ex. D, Ashe Report at 5; Ex. G, 2006–2007 Financial Engagement Sheets.

46.    Although Defendant Frank Sidlow was responsible for reviewing Defendant Vasquez's work for the audits for years ended 2005-2007, Sidlow spent only 6.7 hours reviewing

Vasquez's audit fieldwork. *See* Ex. C, Defendants' Billing Records; Ex. D, Ashe Report at 22–23.

### B.      Defendants' Engagement Letters

47.      Defendants executed engagement letters for each and every year that they performed auditing and accounting services work for Acorn II. *See* Ex. R, Engagement Letters.

48.      The letters set forth in detail what steps Defendants would take in performing their audit work and state as follows:

- An audit includes examining on a test basis, evidence supporting the amounts and disclosures in the financial statements, therefore, our audit will involve judgment about the number of transactions to be examined and the areas to be tested.

- We will plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement, whether from (a) errors, (b) fraudulent financial reporting, (c) misappropriation of assets, or (d) violations of laws or governmental regulations that are attributable to the entity or to acts of management or employees acting on behalf of the entity.

- Our audit will include obtaining an understanding of the entity and its environment, including internal control, sufficient to assess the risks of material misstatement of the financial statements and the design the nature, timing, and extent of further audit procedures.

*See* Ex. R, Engagement Letters.

### C.      The Accounting Services Work

49.      As Acorn's accounting services professionals, Defendants maintained Acorn's books and records based mainly on information provided by Young. *See* Ex. D, Ashe Report at 9–11; Ex. J, Acorn Journal Entries Prepared by Defendants; Ex. K, Sample of Acorn's Books and Records Prepared by Defendants; Ex. L, Defendants' Audit Work Program Listing Accounting Services Tasks.

50.      In addition to preparing Acorn's books and records, Defendants performed other accounting services tasks, including but not limited to:

11

    a.   Preparing and maintaining all accounting records *See* Ex. D, Ashe Report at 9–11; Ex. F, Vasquez Dep. at 70: 7–13 (indicating that valuation summaries prepared for Acorn II investors were maintained in Defendants' server); Ex. J, Acorn Journal Entries Prepared by Defendants; Ex. K, Sample of Acorn's Books and Records Prepared by Defendants; Ex. L, Defendants' Audit Work Program Listing Accounting Services Tasks;

    b.   Preparing investor-specific quarterly fund valuation summaries; *See* Ex. E., Ashe Supplement at 3–4; Ex. F, Vasquez Dep. at 61–64;

    c.   Approving investor disbursements from Acorn II; *See* Ex. A, Ashe Report at 10; Ex. M, Approved Disbursement Signed by Defendant Michael McCudden;

    d.   Allocating partnership income, expenses and capital gains/losses to individual partners based on their respective ownership interests; *See* Ex. N, Sample Allocations Performed by Defendants (investor names have been redacted);

    e.   Determining Acorn II's net asset value at least once per quarter; *See* Ex. N., Sample Allocations Performed by Defendants (investor names have been redacted); Ex. O, Sample Unrealized Gain/Loss Reports Prepared by Defendants (investor names have been redacted); and

    f.   Calculating the management fee and performance fees payable by Acorn II to its General Partner, Acorn Capital.  *See* Ex. P, Defendants' Management Fee Calculations.

51.    Despite performing the foregoing and other accounting services work on a day-to-day basis, Defendants failed to recognize suspicious circumstances with the Acorn account and numerous red flags that Young was running a Ponzi scheme. *See* Ex. E, Ashe Supplement at 3–6. Furthermore, in performing these services, Defendants breached Generally Accepted Auditing Standards, which expressly prohibit such conduct because it puts auditors in the irreconcilable position of auditing their own work. *See* Ex. D, Ashe Report at 8–11.

**D.**    **The Suspicious Circumstances and Red Flags**

52.    As acknowledged by Defendants, Acorn II had no internal controls.  *See* Ex. A, McCudden Dep. at 146; Ex. D, Ashe Report at 8; Ex. E, Ashe Supplement at 4.

12

53.     Virtually all of Defendants' communications were with one individual who had complete and unfettered access to the assets of the fund and knowledge of the investor base. *See* Ex. E, Ashe Supplement at 4.

54.     There were no apparent accounting records maintained by Acorn related to the fund's financial statements. *See* Ex. E, Ashe Supplement at 4.

55.     The frequency and nature of the transactions involving the limited partners' capital accounts changed significantly after July 2005. *See* Ex. E, Ashe Supplement at 4.

56.     From July 2005 through the end of 2005, Young received approximately $2.2 million in distributions from Acorn II, which represents almost 40% of the total distributions for all Acorn II's investors in 2005. *See* Ex. E, Ashe Supplement at 4.

57.     From November 1, 2006 through August 29, 2008, there were at least 36 recorded transactions from the Acorn II account to Young's personal account (number 70673329), yet falsely attributed by Defendants to other Acorn II investors. *See* Ex. D, Ashe Report at Exhibit 1A.[1]

58.     From July 2005 through November 2007, there were at least 52 transfers to one of Young's accounts. *See* Ex. E, Ashe Supplement at 4.

59.     Despite these suspicious circumstances, any and all questions that arose regarding how to classify all Acorn II transactions were directed to Tony Young. *See* Ex. E, Ashe Supplement at 3.

60.     At no time while Defendants were maintaining the capital account balances did they verify the accuracy of the information provided despite instances where the information

---

[1] Exhibit 1A of Mr. Ashe's Report describes in detail the transactions in and out the Acorn account, and Defendants' errors in classifying information. The support for Mr. Ashe's conclusions in Exhibit 1A of his report are based in part on reviewing the Acorn bank statement and the underlying wire transfers showing money coming in and out of the Acorn account. Those documents have been produced to Defendants, but have not been attached hereto because they are voluminous. However, the Receiver can produce those documents upon the Court's request.

provided by Young contradicted the information on Acorn II's bank statements. *See* Ex. A,

McCudden Dep. at 256: 5–15; Ex. F, Vasquez Dep. at 177.

61.    For example, the November 2007 bank statement shows a disbursement of

$120,000 was made on November 16, 2007, and that it went to an account of Donald and Neely

Young. In response to an email from Vasquez, Young attributes this distribution to the

Strawbridge Trust. Despite information that was available on the face of the bank statement,

Vasquez recorded the disbursement to the Strawbridge Trust at Young's direction. *See* Ex. E,

Ashe Supplement at 3.

62.    Defendants have admitted that they should have noticed the discrepancies in the

information being provided by Young simply by looking at Acorn II's bank statements. *See* Ex.

A, McCudden Dep. at 248:24 –250: 7; Ex. F, Vasquez Dep. at 149.

63.    Furthermore, had Defendants tested *any* of Young numerous transactions in 2005,

either in their capacity as Acorn II's accountants or auditors, they would have uncovered the

fraud. *See* Ex. Q, Deposition of James Ashe, Dated Nov. 3, 2011, at 115: 11–18.

**E.    The Investor Specific Quarterly Valuation Summaries**

64.    Despite the foregoing suspicious circumstances and red flags, Defendants prepared

investor-specific quarterly fund valuation summaries throughout their engagement with the Acorn

Entities. Ex. D, Ashe Report at 9–11, 22–23; Ex. E, Ashe Supplement at 3–4; Ex. F, Vasquez

Dep. at 61–64.

65.    The investor quarterly fund valuation summaries materially misstated each

investor's account balance because they were prepared using the untested and unverified

information provided by Young. *See* Ex. E., Ashe Supplement at 3–4.

66.    The investor quarterly fund valuation summaries prepared by Defendants were

sent by Young to Acorn's investors. *See* Ex. E., Ashe Supplement at 3–4.

14

**F.      Defendants Repeated Issuance of Unqualified Audit Opinions**

67.      In addition to breaching their duties as Acorn's accountants, Defendants also breached their duties as auditors by failing to test or verify any of the information regarding transactions in and out of the Acorn II account. *See* Ex. D, Ashe Report at 7, 12–15.  Defendants incorrectly testified that they had no duty to test or verify any information in performing the audit of Acorn II's financial statements. *See* Ex. A, McCudden Dep. at 139: 14–140: 6; Ex. S, Vasquez SEC Dep. at 65: 21–66: 11.

68.      Instead, Defendants relied solely on information provided by Young regarding those transactions, and did so despite the numerous irregularities and red flags that they encountered while performing the day-to-day accounting. *See* Ex. A, McCudden Dep. at 256: 5–15; Ex. D., Ashe Report at 13–15; Ex. F, Vasquez Dep. at 177; Ex. S, Vasquez SEC Dep. at 57–59.

69.      Defendants did so in contravention to Generally Accepted Audited Standards ("GAAS") that require auditors to obtain independent verification of transactions and account balances from third parties, especially when an entity has no internal controls. *See* Ex. D, Ashe Report at 7, 12–15.

70.      Young's misrepresentations were blatant, and should have been obvious were it not for the fact that Defendants assigned one of their most junior and inexperienced accountants to the Acorn account, and failed to supervise or review his work. Ex. D, Ashe Report at 22–23; Ex. F, Vasquez Dep. at 96: 2–5; 125: 4–7; 103:24–104: 2; 105–107.

71.      Indeed, the primary partner assigned to the Acorn account and the associate who performed the fieldwork on the audit have both testified that they should have verified information provided by Young and should have recognized his misrepresentations regarding investor account activity. Ex. A, McCudden Dep. at 256: 5–15; Ex. F, Vasquez Dep. at 177.

72.     Instead, Defendants repeatedly issued unqualified audit opinions falsely representing that Acorn II's financial statements were fairly represented and free from material misstatement — although Young was stealing millions of dollars from the investor capital accounts. *See* Ex. D, Ashe Report at 7.

73.     If not for Defendants' accounting services *and* audit failures, Young would not have been able to perpetrate his scheme through April 17, 2009. *See* Ex. D, Ashe Report at 4, 24 –26; Ex. E, Ashe Supplement at 4, 8–9.

74.     Defendants' misconduct caused Acorn II to suffer damages in excess of $19 million. *See* Ex. D, Ashe Report at 26.

Respectfully submitted,

December 2, 2011

/s/ Patricia M. Hamill
Patricia M. Hamill, Esquire (I.D. No. 48416)
Kevin Dooley Kent, Esquire (I.D. No. 85962)
Francesco P. Trapani, Esquire (I.D. No. 209123)
Conrad O'Brien PC
1500 Market Street, Centre Square
West Tower, Suite 3900
Philadelphia, PA 19102-1921
Telephone: (215) 864-9600

*Counsel for Louis C. Bechtle, Receiver*